**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 31 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

HAROLD E. HOLMES, JR.,

    Petitioner - Appellant,

v.

DAVID R. MCKUNE; ATTORNEY
GENERAL OF KANSAS,

    Respondents - Appellees.

No. 01-3004
D.C. No. 97-CV-3134-DES
(D. Kansas)

**ORDER AND JUDGMENT**[*]

Before **LUCERO**, **PORFILIO**, and **MURPHY**, Circuit Judges.

This appeal arises from the district court's denial of a habeas petition under

28 U.S.C. § 2254. Harold Eugene Holmes, the petitioner and appellant in this

case, was convicted by a Kansas trial court in 1979 of rape, aggravated battery,

and aggravated kidnapping. Following his conviction and a direct appeal, Holmes

initiated two state post-conviction proceedings arguing ineffective assistance of

counsel, which were denied. Both denials were appealed to the Kansas Court of

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Appeals, but Holmes did not obtain any relief in state court. On April 15, 1997, Holmes filed a petition for a writ of habeas corpus in the federal district court, again arguing that his trial counsel was ineffective.

Holmes's federal habeas petition was dismissed by the district court, but the district court granted a certificate of appealability ("COA") as to the issue of whether Holmes's trial counsel was ineffective for failing to investigate Holmes's alibi defense and interview potential witnesses.[1] We have jurisdiction over Holmes's appeal pursuant to 28 U.S.C. § 1291,[2] and we reverse and grant habeas relief.

---

[1] We expanded the COA to include the issue of whether trial counsel was also ineffective for failing to object to hearsay hypnosis testimony. This claim may be procedurally barred, as conceded by Holmes's counsel in a supplemental brief. Because, as discussed below, we conclude that Holmes's trial counsel's failure to call alibi witnesses constituted ineffective assistance of counsel and prejudiced Holmes's trial, however, we do not reach the issue of whether trial counsel was also ineffective for failing to object to the hearsay hypnosis testimony.

[2] Holmes' release on parole on December 31, 2001, does not divest us of jurisdiction or render this action moot. The restrictions on Holmes as part of his probation—including restriction to a particular residence, mandatory meetings with a parole officer and participation in counseling, a requirement that the parole officer approve any job, and the risk of return to jail should parole conditions be violated—constitute sufficient restrictions on Holmes's liberty such that he is "in custody" for habeas jurisdictional purposes, and his case is not moot. See Jones v. Cunningham, 371 U.S. 236, 242–43 (1963); see also Jago v. Van Curen, 454 U.S. 14, 21 n.3 (1981); Olson v. Hart, 965 F.2d 940, 942–43 (10th Cir. 1992) ("Probationary status is sufficiently 'in custody' pursuant to section 2254 to permit habeas relief.").

**I**

Because our analysis in this case will ultimately depend on a review of the evidence presented at trial, we provide here a thorough overview of the events leading up to Holmes's trial, the trial itself, and Holmes's first post-conviction hearing. See Avery v. Alabama, 308 U.S. 444, 447 (1940) ("[W]here denial of the constitutional right to assistance of counsel is asserted, its peculiar sacredness demands that we scrupulously review the record.").

**A**

On August 21, 1978, shortly after 9:30 p.m., a woman was assaulted by two African-American men near Coronado Junior High School in Wyandotte County, Kansas. After a struggle, the two men dragged the victim away from her vehicle into a wooded area, where one of the men proceeded to rape her. Pretending to be unconscious, the victim lay still while the two men continued to assault her. When the men left, the victim fled to a nearby house.

At 10:48 p.m., police responded to a call from the house where the victim was waiting. Interviewed by a police officer, the victim described the taller assailant as being "approximately 20 to 30 years old, approximately six foot in height, weighing somewhere between 160 to 170 pounds, with a normal medium size natural hairdo." (6 R. at 55.) The victim described the shorter assailant as "approximately 20 to 25 years of age, approximately five foot eight to five foot

ten inches in height, approximately 150 pounds, with a bushy . . . hairdo." (6 id.) Asked about the clothing worn by the assailants, the victim could not give any description.

Either before or after her interview with the police, the victim, an art teacher, prepared an abstract drawing of one of the assailants. After making the drawing, she wrote some comments on the side pointing out the assailant's features. In these comments, she described his ears as close to his head, his cheek bones as prominent, high, and somewhat delicate, his mouth as rectangular and wide but "not overly prominent," his nose as delicate and straight but not flat, flaring out at the base to become wide, his eyes as large and rectangular without prominent folds, his forehead as small, thin, and high, and his eyebrows as straight. (6 id. at 111–12.)

When the victim spoke to a detective at the police station the day after the rape, she provided further details on the appearance of the two assailants. She told the police that she thought the first individual was about five foot eleven, because he was slightly taller than she was and she is five foot nine. She described the other assailant as shorter than her, with a "sloppy big Afro" the top of which was no higher than her eyes. (6 id. at 188.)

On August 29, 1978, eight days after the rape, the police showed the victim a series of six photographs. Among them were photographs of Holmes, another

male named Larry Kelly, and a boy named Willie Triplett. The photographs of Holmes and Kelly were large mug shots, while the other photographs were smaller, obtained from Coronado Junior High. Looking at these photographs, the victim told the detective that Kelly "looked like the tall suspect who raped her" and Triplett looked "similar to" one of the assailants. (6 id. at 225–26.) At trial, no one testified that the victim positively identified the mug shot of Holmes on this date.

On October 4, 1978, the victim went to the police station to view a lineup. Holmes was one of the men in the lineup, wearing a gray jumpsuit similar to the one he had worn in the photograph already shown to the victim. Of the men in the lineup, Holmes was the only one whose photograph had been previously shown to the victim. He attempted to exit the room, calling the procedure a "frame-up." (6 id. at 196.) The victim, who had been shown a mug shot of Holmes several weeks before, observed the men in the lineup. She indicated on the lineup form that she recognized Holmes.

The police interviewed Holmes on October 6. Holmes told the police that, on the evening of August 21, 1978, he played frisbee near his house with several boys: Jake Carmack, Jake's cousin Danny, Jim and Bobby Bailey, a boy named John, and possibly Rick Alexander and Neil Phelps. Holmes stated that he played frisbee from 8:30 or 9:00 p.m. to 10:00 or 10:30 p.m., at which point the boys

pooled their money to purchase marijuana. After Bobby Bailey returned with the marijuana, explained Holmes, the boys went into the woods north of Holmes's house and built a campfire.

Holmes told the police that Jake Carmack, Danny, and Bobby Bailey went camping with him. The boys left the campsite twice, once to get cigarettes and once to get food. After the boys went to Holmes's house to get some food, they encountered a policeman, who told them to make sure they put out the fire. Holmes could not recall the exact time they saw the policeman. Holmes told the police that he found out about the rape in the local newspaper the next day, and was glad he had an alibi. Holmes stated that he did not go to Coronado Junior High School, the site of the rape, at any point that evening. Holmes also denied going to Frank Harvey's house or seeing Harvey, Ricky Miller or Willie Triplett at any point during the evening of August 21.

In the fall of 1978, Holmes shot and killed Miller, and Holmes was charged with voluntary manslaughter in conjunction with Miller's death. A judge appointed Dave Boal, an attorney, to represent Holmes in conjunction with the manslaughter charge. While the manslaughter charge was still pending, Holmes was also charged with the rape, assault, and kidnapping at Coronado Junior High, and he retained Boal to represent him in the rape charge as well. At the time of

his trial for rape, Holmes was eighteen years old and had a ninth-grade education. He had never before been involved in or attended a trial.

Boal filed a notice of alibi in the rape case, and Holmes provided him with a list of several potential witnesses who were playing frisbee with him on the evening of August 21. Boal, however, did not speak with any of these potential witnesses, apparently relying on Holmes to bring them to his office. Boal read the police statements of three of Holmes's suggested alibi witnesses, and became "somewhat disenamored with the quality of his alibi defense." (5 id. at 24–25.)

**B**

At trial, the victim identified Holmes as the man who raped her. Comparing a photograph of Holmes to the comments she wrote next to her drawing of the primary assailant, the victim testified that her description matched the photograph. According to the victim, Holmes was the taller of the two assailants. Although the victim referred to her primary assailant as "Mr. Holmes" throughout her testimony, the victim admitted that she had learned that name only after the incident. The victim testified that she had been hypnotized in an effort to recall her assailants' names, but could not recall what name the smaller man had called the other assailant.[3] On cross-examination, the victim testified that it

---

[3] A police detective testified that the victim had remembered the names "Gene" and "Jerry" under hypnosis. (6 R. at 192.) Boal did not object to this

(continued...)

was dark at the time of the rape, although there was some artificial light and she could see.

In order to corroborate the victim's identification of Holmes, the State called Willie Triplett, a sixteen-year old boy and the cousin of Ricky Miller. Triplett said that he saw Holmes on the evening of August 21. Triplett testified that he arrived home at around 9:30 or 10:00 and had a phone conversation with Holmes, after which Holmes arrived at Triplett's house and talked to him about the rape. According to Triplett, Holmes took a shower or bath "to get the blood off him." (6 id. at 266.) Triplett testified that Holmes talked to him for about half an hour, until 10:45.

Triplett claimed that, during this conversation, Holmes confessed to the Coronado Junior High rape in the presence of Triplett and Miller. A week later, Triplett claimed, Holmes confessed again in the presence of Triplett and another boy named Frank Harvey. On cross-examination, Triplett testifed that his cousin Miller had been about six foot two, while Holmes was five foot nine or five foot eight. Although he claimed not to be aware that the victim had identified him as looking like one of the assailants, Triplett admitted to having heard that the victim "was picking out a lot of people." (6 id. at 272–73.)

---

[3](...continued)
hearsay testimony. Holmes's middle name was Eugene, a fact pointed out by the prosecutor.

In addition to Triplett, the State called a fifteen-year-old boy named Frank Harvey. Harvey denied having seen Holmes on the night of August 21, but testified that he later asked Miller if it was "true that they did it, and he said yeah." (6 id. at 278–79.) Harvey further claimed that he "kind of knew that [Holmes] was with [Miller]" during the attack because it "was being said." (6 id. at 279.) On cross-examination, Harvey said he did not know who had told him that Holmes was involved in the rape. Nevertheless, the State called another witness, a police detective, who testified that Harvey had told him that Holmes had told Triplett that "they had committed the crime." (6 id. at 285.)

Boal knew that Holmes had been in a long-standing feud with Triplett and that Holmes had killed Triplett's cousin. Nevertheless, Boal introduced no evidence concerning the circumstances of Miller's death, because Boal feared it might prejudice the jury to know that Holmes was charged with manslaughter.

A criminalist called by the State testified that both Holmes and the victim were secretors with type A blood, and that seminal fluid obtained after the rape was also from a person who was a type A secretor. This information allowed her to conclude that Holmes "could not be eliminated" as the person who raped the victim. (6 id. at 149.) No testimony was introduced as to the proportion of African-American males who have type A blood.

Conceding that Holmes had camped in the woods on August 21, the State called three of the boys with whom Holmes had camped. The State's theory was that Holmes went camping with these boys <u>after</u> he had participated in the attack, in an attempt to create an alibi.

Robert "Bobby" Bailey testified that he was with Holmes on August 21 and that they went camping in the woods near their homes at about ten o'clock. He said that the police came by at around eleven o'clock to check out a neighbor's complaint about the campfire, and that he had been with Holmes "at least a couple hours" before then. (6 <u>id.</u> at 237.) To impeach his testimony, the prosecutor showed Bobby Bailey his police statement, in which he said that he had been with Holmes "about an hour" before the police arrived. (6 <u>id.</u> at 238–39.) On cross-examination, Boal elicited testimony that, according to Bobby Bailey's police statement, they had collected money for marijuana at about fifteen minutes until ten, that Holmes had been with him about fifteen minutes prior to that time, and that Bobby was sure that it was before ten when he first saw Holmes. This account suggested that Holmes could not have committed the rape shortly after 9:30, although Bobby Bailey's confusion over how long he had been with Holmes prior to the arrival of the police rendered his testimony less credible.

Next, James "Jim" Bailey testified that he, too, was with Holmes on August 21. He stated that they played frisbee before going to the woods, that he stayed in

the woods about a half-hour and then left to go home for food, and that he saw the rest of the boys again playing frisbee after the police left. Jim Bailey did not testify that he smoked marijuana, and he explained that he was not present when the police came about the fire. Showing Jim Bailey his prior police statement, the prosecutor called attention to the fact that he had not previously told the detective that the group had also played frisbee before going to the woods. On cross-examination, Boal elicited testimony showing that the detective had never asked Jim Bailey what time it was when he first saw Holmes. Jim Bailey's testimony corroborated Holmes's statement that he played frisbee before going camping. Because Jim Bailey did not testify as to the exact time he first saw Holmes, however, his testimony did not prove that Holmes could not have committed the rape.

James "Jake" Carmack testified that he also played frisbee with Holmes, Bobby and Jim Bailey, and Neil Phelps on August 21, and that they subsequently went camping in the woods. This account matched Holmes's story. Carmack stated that, although he did not know exactly what time it was when he first saw Holmes, "the streetlights were about to come on, kind of a pink color, when I saw him walking up." (6 id. at 248.) He also testified that the streetlights start coming on about twenty minutes before dark, suggesting that he saw Holmes before the rape, which occurred shortly after 9:30.

Carmack was then asked to read aloud his prior police statement in which he estimated that the police talked with them about the campfire at about 10:00 or 10:30 p.m. Carmack testified that he had been with Holmes "about two hours" prior to that time. (6 id. at 250.) This testimony was impeached with his prior statement that he had been with Holmes "about an hour and a half" prior to the police visit. (6 id. at 251.) On cross-examination, Carmack explained that they played frisbee in front of John Viens's house and that Carmack then asked Holmes if he wanted to go camping with him and some of the other boys. Carmack stated that they broke up logs for a fire, built the fire, and had returned to Viens's house when the police arrived to tell them not to leave the fire.

Bobby Bailey and Jake Carmack, therefore, estimated that the police responded to the campfire sometime between ten and eleven o'clock. These estimates were demonstrated to be incorrect when the State introduced a dispatch card showing that the police responded to a call about the campfire a minute before midnight. Holmes's alibi defense thus depended on the testimony of two boys called by the State whose time estimates contradicted the dispatch card.

Boal called no alibi witnesses. Holmes was the only defense witness. Holmes essentially testified to the same facts given in his prior police statement, adding that he went to his house and got permission before camping with the boys. He also testified that a neighbor had become disturbed over the noise the

- 12 -

boys were making as they were breaking up logs to build their campfire. He denied being with Triplett on August 21 and denied being present at any later conversation in which Harvey asked anyone about the rape. Holmes further testified that he wore his hair fairly short in August 1978 and never wore a sloppy Afro.

On cross-examination, Holmes testified that Triplett and Harvey were lying or mistaken when they testified about conversations concerning the rape. The prosecutor asked Holmes about alleged discrepancies between his story and the testimony of Bobby and Jim Bailey and Jake Carmack. Boal did not offer any redirect, nor did he call any witnesses to corroborate Holmes's testimony.

In his closing argument, the prosecutor focused on the victim's identification of Holmes as the taller assailant and her drawing and description of the assailant. Asserting that the "only documented time," other than the victim's testimony, was on the police dispatch card, and noting that the boys who testified Holmes went camping with them smoked marijuana that night (6 id. at 329), the prosecutor claimed that Holmes had "set up an alibi," but "the time differentials . . . are not there" (6 id. at 347).

After the closing arguments, the jury deliberated for two hours and then requested to hear Triplett's testimony again. The next day, the jury deliberated for a little over two more hours before finding Holmes guilty of all charges.

## C

On June 3, 1983, the state court held a post-conviction hearing on Holmes's claim of ineffective assistance of counsel. Boal was called as the first witness, but did not recall much about Holmes's case. Boal testified that he did not telephone or interview any of the alibi witnesses prior to filing the notice of alibi defense or prior to trial, nor did he subpoena any of them for trial.

His stated reasons for not doing so were twofold. First, Boal said that he relied on Holmes to bring the witnesses to his office and that Holmes failed to do so. Second, he claimed that he had "no way of knowing whether or not the police interviewed witnesses beyond [the three boys the State called at trial]," and, after reading the three statements of these three boys, he became "somewhat disenamored with the quality of [Holmes's] alibi defense." (5 id. at 21–22, 24–25.) Boal said he "didn't bother recalling" the three witnesses after the State rested because Holmes had told him that the three witnesses would verify his alibi, but they had failed to do so at trial. (5 id. at 22.) Boal had no other explanation for having failed to investigate and interview witnesses not called by the State who could have testified about Holmes's activities on the night of the rape.

Boal stated that he could not remember the content of conversations with the defendant's mother, Mrs. Holmes, could not remember whether he listed her

as an alibi witness,[4] and could not remember the defendant Holmes saying that he wanted her to testify on his behalf. Later, he recanted and testified that his recollection was ("and this may not be accurate") that he, Mrs. Holmes, and the defendant Holmes discussed calling her and determined that she would not be a witness. (5 id. at 18.) He could not remember, however, on what they had based that determination.

Holmes's mother also testified at the post-conviction hearing. Mrs. Holmes asserted that Boal had told her that she might be needed as a witness and had her wait in the hall or at work during most of the trial. She said that Boal never contacted her to testify about where Harold was the evening of the rape or told her why she was not needed as a witness. Mrs. Holmes testified that she knew where her son was from about 8:00 until 10:00 p.m. that night because she was "keeping an eye on him," looking outside "every so often." (5 id. at 50–51.) She stated that her son asked permission to "go someplace" at around 10:00 p.m.[5] (5 id. at 52.)

Holmes was called as the next witness. He testified that, the day Boal was appointed as counsel for the rape case, he told Boal that he did not commit the

---

[4] According to the state, the defense did list Mrs. Holmes as an alibi witness.

[5] Counsel cautioned Mrs. Holmes not to reveal the specific details of her knowledge.

- 15 -

crime and gave him the names of the young men he was with on the evening of the rape. Holmes further testified that he had explained to Boal that Willie Triplett had been in a long-standing, violent feud with Holmes and that Holmes had shot and killed Triplett's cousin Ricky Miller. Holmes explained that he had beaten up Triplett and that Triplett had threatened him with a shotgun. The State did not recall Boal to dispute any of this testimony.

Holmes stated that, a month before the trial, he went to Boal's office with a list of witness names and addresses, but Boal was not there. Holmes left the list with Boal's secretary. According to Holmes, when it became clear that Boal was not going to call any of his alibi witnesses, Boal told him that it was unnecessary because "[t]he State didn't have a case" and "there was no way they could convict me on that."[6] (5 id. at 64.)

Neil Phelps White, also referred to as Neil Phelps, was the last witness at the hearing. He testified that on August 21 Holmes was playing frisbee with him, his brother Scott Phelps, Jake and Danny Carmack, and John Viens "about all afternoon" up until "around 10:00, 10:30." (5 id. at 97.) Neil Phelps was never contacted by Boal to testify at the 1979 trial. He testified that he and several other boys had given statements to the police, but the State did not attempt to

---

[6] The court did not believe this testimony at the post-conviction hearing.

impeach his testimony with his prior police statement, suggesting that the statement was consistent with his testimony at the post-conviction hearing.

After hearing the evidence, the judge asked Holmes's counsel if he agreed that "an attorney has a right to rely upon his client to do some of the leg work in getting witnesses in to talk to you before trial." (5 id. at 114.) The court admonished Holmes for not having brought the witnesses to Boal's office prior to trial, stating, "It is somewhat difficult . . . in our community, for a white lawyer to go into a black community and try to find witnesses without some assistance." (5 id. at 129.) When Holmes's counsel told the court that it was a "white" community, and that Holmes's was the only black family, the court stated, "I just feel that Holmes had some obligation to assist in this matter." (5 id.) The court then found that the three witnesses at trial did not "materially assist the defendant in his alibi defense," and that, after Boal read their statements, he may have determined that other witnesses "likewise would not assist the defendant and perhaps would even be detrimental to his defense." (5 id.)

The state trial court denied post-conviction relief, and the Kansas Court of Appeals affirmed on appeal. Nine years later, Holmes brought another state post-conviction proceeding, challenging hypnosis testimony introduced at trial and arguing that the judge in the first post-conviction proceeding was racially prejudiced. This second post-conviction proceeding was also unsuccessful, and

the Kansas Court of Appeals refused to reconsider the issue of ineffective assistance of counsel. Finally, Holmes brought a petition for habeas corpus in the federal district court, which was denied and is the subject of this appeal.

## II

Because Holmes filed his petition in federal court on April 15, 1997, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") govern this appeal. See Paxton v. Ward, 199 F.3d 1197, 1204 (10th Cir. 1999) (stating that AEDPA applies to habeas petitions filed after April 24, 1996, regardless of the date of the criminal trial forming the basis of the conviction). Our standard of review depends on whether a particular claim was decided on the merits in state court. With regard to any claim that was "adjudicated on the merits in State court proceedings," the writ of habeas corpus will not be granted unless the adjudication of that claim

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court commented on the meaning of § 2254(d)(1). With regard to the first clause of § 2254(d)(1), a

state-court decision is "contrary to" the law established by the Supreme Court if (1) "the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from [the Court's] precedent." Id. at 405–06 (opinion of O'Connor, J.) (speaking for a majority of the Court). A state-court decision is an "unreasonable application" of Supreme Court precedent if (1) "the state court identifies the correct governing legal rule from [the] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case," or (2) "the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407. It is not sufficient if the state-court decision applied clearly established law erroneously or incorrectly: "that application must also be unreasonable." Id. at 411. However, the petitioner need not show that "all reasonable jurists" would disagree with the state court's decision. Id. at 409–10.

Factual issues decided by the state courts are presumed to be correct, and Holmes bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). If a claim was not addressed by a state court, there is no adjudication of that claim, and we review the federal

district court's legal determinations de novo and its factual findings for clear error.  See Romano v. Gibson, 278 F.3d 1145, 1150 (10th Cir. 2002).[7]  "Where the district court's factual findings are based solely upon a review of the state court record, however, they are subject to this court's independent review."  Tyler v. Nelson, 163 F.3d 1222, 1226–27 (10th Cir. 1999).  In this case, the federal district court did not hold an evidentiary hearing, basing its factual findings only on a review of the state court record.  Thus, the facts relied on by the district court are subject to our independent review.

## A

Holmes urges that his ineffective assistance of counsel claim should be evaluated according to the criteria enunciated by the Court in Strickland v. Washington, 466 U.S. 668 (1984).  Strickland is also cited by the government, and its two-prong test was relied upon by the district court.  As was pointed out at oral argument by counsel for the government, however, Strickland was decided by the Supreme Court four days after May 10, 1984, when the Kansas Court of

---

[7]  Where there is no evidence that a state court did not address a particular claim, we owe deference to the state court's result.  Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999).  If there is evidence that a particular claim was altogether not considered by the state court, however, we do not defer to the state court's result with respect to that claim.  See Duckett v. Mullin, 306 F.3d 982, 990–91 n.1 (10th Cir. 2002) (stating that, where there is "ample evidence" that the state court failed to consider a particular claim altogether, "there is no result to which we can defer").

Appeals decided Holmes's appeal of his first post-conviction proceeding. Thus, Strickland was not "clearly established federal law" when the Kansas Court of Appeals issued its first decision in Holmes's case. Holmes did file a subsequent post-conviction proceeding, which was decided on appeal by the Kansas Court of Appeals in 1993. This subsequent appellate decision, however, did not "reach[] the merits" of Holmes's ineffective-assistance-of-counsel claim, reasoning that it had already been decided on the merits. Holmes v. State, No. 68,710, slip op. at 6 (Kan. Ct. App. July 30, 1993). As such, in analyzing the ruling of the Kansas Court of Appeals with respect to Holmes's ineffective-assistance-of-counsel claim, we must look to the federal law as established by the Supreme Court prior to Strickland. Only if the 1984 decision of the Kansas Court of Appeals was "contrary to" or "an unreasonable application of" Supreme Court law as it existed prior to Strickland may we grant Holmes habeas relief.

Long before Strickland, the Supreme Court recognized that the right to counsel is the right to effective assistance of counsel. See, e.g., Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) ("[T]he Sixth Amendment does more than require the States to appoint counsel for indigent defendants. The right to counsel prevents the States from conducting trials at which persons who face incarceration must defend themselves without adequate legal assistance."); McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970) ("It has long been

- 21 -

recognized that the right to counsel is the right to effective assistance of counsel."). Moreover, the Court held that the right to effective assistance of counsel imposed upon the attorney the duty to conduct an adequate investigation of the facts. See Powell v. Alabama, 287 U.S. 45, 58 (1932). When the Kansas Court of Appeals decided Holmes's 1984 appeal, therefore, it was "clearly established" Supreme Court law that the Sixth Amendment guaranteed criminal defendants effective assistance of counsel, and that an attorney's failure to investigate the facts constituted a violation of this constitutional guarantee.

Although the Supreme Court had made it clear long before Strickland that effective assistance of counsel was constitutionally guaranteed in criminal cases, lower federal courts differed on the appropriate test to determine whether a Sixth Amendment violation had occurred. A few years before Strickland was decided, three circuit courts still held that "the representation of a defendant will be deemed adequate as a matter of constitutional law unless it was such as to make a mockery, a sham or a farce of the trial." Maryland v. Marzullo, 435 U.S. 1011, 1011 (1978) (White, J., dissenting from the denial of certiorari) (quotation omitted) (citing cases from the First, Second, and Tenth Circuits). Other circuits employed a different articulation of the standard, requiring that defense counsel render "reasonably competent assistance." Id. (quotation omitted) (citing cases from the D.C., Fifth, and Eighth Circuits).

By the end of 1983, all the circuits had adopted the "reasonably competent assistance" articulation of the standard.  See Trapnell v. United States, 725 F.2d 149, 152–55 (2d Cir. 1983) (stating that "[t]he Second Circuit is now the only circuit court that has . . . not embraced the 'reasonably competent assistance' standard," and proceeding to adopt that articulation of the standard).  Because the "reasonably competent assistance" standard was developed in the circuit courts, however, it was not "clearly established" by the Supreme Court until 1984, although the Court "indirectly" recognized the standard in McMann.  See Strickland, 466 U.S. at 687.  Even so, it was clearly established by the Supreme Court that effective assistance of counsel was required, and a state court could only have reasonably applied Supreme Court precedent before Strickland by adopting one of the two prevailing interpretations or an equivalent test.[8]  A defendant whose counsel both made a "mockery of justice" and failed to render "reasonably competent assistance" would have received ineffective assistance under any reasonable application of Supreme Court law.  Moreover, when the two standards were compared in Strickland, the Supreme Court acknowledged that the divergent standards were applied identically in practice.  466 U.S. at 696.

---

[8]  We will not speculate as to other possible tests that might have been invented by a maverick state court before Strickland, because any test that set a higher threshold than the "mockery of justice" standard would not have been a reasonable application of Supreme Court precedent.  As discussed below, we hold that the "mockery of justice" test was satisfied here.

- 23 -

We hold that, under either the "mockery of justice" standard or the "reasonably competent assistance" standard, Boal's complete failure to interview and call any alibi witnesses constituted ineffective assistance of counsel. Boal expected Holmes to bring the witnesses to his office, when the preparation of the defense was clearly his obligation. See Wainwright v. Sykes, 433 U.S. 72, 93 (1977) ("Once counsel is appointed, the day-to-day conduct of the defense rests with the attorney.") (Burger, C.J., concurring). Holmes's entire defense rested on his alibi, and Boal made no effort to contact the witnesses on Holmes's list even by telephone. Defense counsel must always investigate an alibi defense. See Powell, 287 U.S. at 58. If for no other reason, an investigation may reveal that the alibi defense is fabricated, in which case the attorney must withdraw from representation. Williams v. Florida, 399 U.S. 78, 105–06 (1970) (Burger, C.J., concurring) (discussing defense counsel's obligations when an alibi defense is discovered to be "contrived and fabricated"). Instead, Boal relied on police statements taken down for the purpose of inculpating Holmes, essentially delegating to the State his duties as defense counsel. Such delegation is impermissible.

Boal's conduct clearly falls short of what can be expected of a reasonably competent attorney. This was essentially the view of the federal district court, which stated that "[i]t may be assumed that it is unreasonable for defense counsel

not to attempt to contact alibi witnesses to ascertain whether their testimony would aid the defense." Holmes v. McKune, 117 F. Supp. 2d. 1096, 1109 (D. Kan. 2000).[9] Furthermore, given that Holmes's alibi was the cornerstone of his case, Boal's failure to investigate Holmes's alibi defense rendered the trial a mockery of justice. Holmes's only defense was abandoned by his own attorney, leaving nothing but Holmes's testimony to counter the State's case against Holmes. Under any reasonable application of pre-Strickland Supreme Court law, therefore, Boal fell short of the standard required by the Sixth Amendment.

**B**

In order to conclude that the Kansas Court of Appeals unreasonably applied Supreme Court law, however, we must further examine whether Boal's failure to call alibi witnesses prejudiced the defense. The issue of prejudice was not addressed by the Kansas state courts; consequently, there is no adjudication of that issue, and we review de novo the district court's determination that there was

---

[9] Although the district court did not explicitly find that Boal's performance was deficient, the court did state that "[o]n the record currently before the court, it cannot be found that counsel made a reasonable decision that further investigation of Holmes' alibi defense was unnecessary." Holmes v. McKune, 117 F. Supp. 2d. at 1111. The court ultimately rejected Holmes's ineffective assistance of counsel claim for failure to show prejudice. Id. at 1113. As discussed below, we conclude that Boal's failure to interview and call alibi witnesses was indeed prejudicial.

- 25 -

no prejudice.[10]

Under Strickland, in order for counsel's performance to constitute ineffective assistance of counsel, counsel's deficiencies must have prejudiced the defense. 466 U.S. at 692. Prejudice was a required component of ineffective assistance of counsel even before Strickland. In 1981, discussing prior cases on effective assistance of counsel, the Court stated that the "premise of our prior cases is that the constitutional infringement identified has had or threatens some adverse effect upon the effectiveness of counsel's representation or has produced some other prejudice to the defense." United States v. Morrison, 449 U.S. 361, 365 (1981). Without a prejudicial impact on a criminal proceeding, the Court held, "there is no basis for imposing a remedy." Id. Thus, the 1984 ruling of the Kansas Court of Appeals can only be deemed an unreasonable application of

---

[10] In reaching its conclusion that Boal's failure to call alibi witnesses did not prejudice the defense, the district court viewed the evidence "in the light most favorable to the State." Holmes v. McKune, 117 F. Supp. 2d. at 1112. Viewing the evidence in a "light most favorable to the State" is our standard for insufficiency-of-the-evidence claims, see, e.g., Romano, 278 F.3d at 1154, and no such claim is at issue in the instant case. When we review a claim that the evidence is insufficient, we are reevaluating evidence that was already considered by the jury, and thus the government should be given the benefit of the doubt. In such a case, given that the jury had the challenged evidence before it, we start from the presumption that the verdict was correct. By contrast, there is no reason to view evidence not presented at trial—such as the testimony of Mrs. Holmes and Neil Phelps—in the light most favorable to the government, because this evidence was never assessed by the jury and played no role in the jury's decision. Accordingly, the district court erred to the extent that it evaluated evidence not presented at trial in the light most favorable to the government.

Supreme Court law if the failings of Holmes's trial counsel prejudiced his defense.

Although we are applying pre-Strickland standards, the prejudice requirement of Strickland added nothing new to the law as it stood at the time of Holmes's first state collateral appeal. See Morrison, 449 U.S. at 365 (discussing the pre-Strickland prejudice requirement); cf. Strickland, 466 U.S. at 697 (explaining that "only in the rarest case" would the Strickland test alter the merit of an ineffectiveness claim). Other circuits, applying the Strickland standard on habeas review, have found that a failure to call key alibi witnesses was prejudicial to the defense. In Washington v. Smith, 219 F.3d 620 (7th Cir. 2000), the Seventh Circuit found prejudice when defense counsel failed to call three alibi witnesses who could have added "a great deal of substance and credibility" to the defendant's alibi. Id. at 634–35. The court reached this result even though the defense did call two other individuals as alibi witnesses. Id. at 625. In Luna v. Cambra, 306 F.3d 954, 961–62 (9th Cir. 2002), the Ninth Circuit held that a failure to call the defendant's mother and sister as alibi witnesses was prejudicial, despite their family ties to the defendant.

As discussed above, at his state post-conviction hearing, Holmes called four witnesses: Boal, Holmes's mother, Holmes himself, and Neil Phelps. Holmes's mother and Neil Phelps, neither of whom was called to testify at

Holmes's trial, explained at the post-conviction hearing that they would have corroborated Holmes's alibi. The testimony of Mrs. Holmes and Neil Phelps differed significantly from that of the boys called by the prosecution at trial, insofar as Mrs. Holmes and Neil Phelps testified only as to Holmes's whereabouts before and during the time that the rape occurred.

Noting that she was readily available to testify at her son's trial, but was not called, Mrs. Holmes explained at the post-conviction hearing that she knew where her son was until ten o'clock on the night of the rape because she "was keeping an eye on him." (5 R. at 50.) Mrs. Holmes regularly looked out the window to check on her son from approximately seven or eight o'clock to ten o'clock at night. Around ten o'clock, Holmes asked his mother permission to "go someplace." (5 id. at 52.) This testimony meant that Holmes could not have committed the rape shortly after 9:30. Had Mrs. Holmes been allowed to give this testimony at trial, it would therefore have corroborated her son's alibi to the extent the jury believed her.

Neil Phelps, a neighbor of Holmes, testified that he played Frisbee with Holmes and several other boys "about all afternoon" on the day of the rape, until "around 10:00, 10:30."[11] (5 id. at 97.) Phelps claimed that, to the best of his

_____

[11] As the district court notes, Phelps's assertion that he played frisbee with Holmes "about all afternoon," taken literally, seems to conflict with Holmes's

(continued...)

- 28 -

recollection, Holmes was with him the entire time he was playing Frisbee. Phelps then "went to ask [his] mom," presumably for permission to go camping with the other boys. (5 id.) Phelps did not testify about what happened on the night of the rape after he played frisbee with Holmes. Some time after the rape, Phelps gave a statement at the courthouse, but Boal never contacted him. Because Phelps claimed Holmes was with him until 10:00 or 10:30, his testimony implied that Holmes could not have committed the rape shortly after 9:30.

Phelps's testimony and that of Mrs. Holmes, if believed by the jury, would thus have corroborated Holmes's alibi without reference to the arrival of the police at the campfire. Because Mrs. Holmes was the petitioner's mother, her testimony might have been discounted somewhat by the jury. Phelps, however, was not a relative of Holmes, and his testimony would have been less subject to attack by the prosecution.

Unlike Bobby Bailey and Jake Carmack, Phelps did not testify that he smoked marijuana on the night of the rape, and his memory of how long he spent

_____

[11](...continued)
account of his activities on the afternoon the rape occurred. Holmes v. McKune, 117 F. Supp. 2d at 1113. It is probable, however, that Phelps simply meant "evening" rather than "afternoon." A frisbee game that began in the afternoon and lasted until ten o'clock at night would have been a very long frisbee game indeed. In any event, the importance of Phelps's testimony lies in his estimation of the time he last saw Holmes, not the length of time he was with Holmes prior to the time the rape occurred.

playing frisbee with Holmes was not impaired by any effects of the drug. During his closing argument, the prosecutor called attention to the fact that the boys who went camping with Holmes had been smoking marijuana, the prosecutor's implication being that this might have affected their memory.[12] If Phelps had testified at trial as he did at the post-conviction hearing, the defense could have pointed to a witness who had a clear recollection of the time he last saw Holmes and whose recollection was not affected by drug use.

Furthermore, no evidence was introduced at the post-conviction hearing suggesting that Phelps's testimony contradicted his prior police statement. If the State could have impeached Phelps by pointing to inconsistent statements given to the police, they would have done so at the post-conviction hearing. At trial, the prosecutor was able to discount the testimony of the boys who testified as to Holmes's whereabouts by referring to their police statements and reckoning back from the time the police arrived at the campsite.

Because the police arrived after midnight, and two of the boys said in their police statements that Holmes had been with them "about an hour" or "an hour and a half" before the police arrived (6 id. at 239, 251), the prosecutor was able

---

[12]  Jim Bailey did not testify that he smoked marijuana with the other boys. Jim Bailey, however, did not recall what time it was when he first saw Holmes or when he left the group, explaining that he did not wear a watch. His testimony, therefore, did not help Holmes establish an alibi, unlike that of Neil Phelps.

to assert that Holmes was with the boys only since about 10:30 or 10:15, after the rape occurred. This meant that the testimony of the two boys did not prove that Holmes was with them at the time of the rape. Phelps, by contrast, testified that he was with Holmes until about 10:00 or 10:30. Thus, Phelps's testimony did not contradict that of the three boys who testified at trial,[13] and Phelps established where Holmes was during the crucial hour from nine to ten o'clock.

Phelps's testimony, therefore, would have considerably strengthened Holmes's case. In response to the prosecutor's impeachment of the three other boys who testified, Boal could have pointed to one witness (1) whose perception of time was unaffected by marijuana, and (2) who could vouch for Holmes's whereabouts at the time of the rape without reference to the later arrival of the police at the campsite.

Had Phelps testified, the defense could have responded more effectively to a statement by the prosecutor during closing argument that "[t]he time differentials involved are not there" for Holmes's alibi (6 id. at 347). Likewise, the prosecution's assertion that the "only documented time," other than the victim's testimony, was on the police dispatch card (6 id. at 329) would have

---

[13] Two of the boys, Jim Bailey and Jake Carmack, did not testify as to the exact time they stopped playing frisbee, and thus their testimony cannot conflict with that of Phelps. The other boy, Bobby Bailey, stated that the boys took up a collection to purchase marijuana at about fifteen minutes to ten, which fits with Phelps's testimony that he was with Holmes until about 10:00 or 10:30.

carried less weight in the face of an unimpeachable recollection by Phelps. Phelps's testimony would have been the cornerstone of Holmes's alibi defense, had he been called to testify at trial. Instead, the only alibi witnesses called were <u>state</u> witnesses, and Boal had not spoken with any of them prior to the trial.

As discussed above, other circuits have held that a failure to call key alibi witnesses can be prejudicial even if the defense <u>did</u> call some alibi witnesses (as in <u>Washington</u>) or the witnesses <u>not</u> called had family ties to the defendant (as in <u>Luna</u>). In the present case, only one witness had family ties to the defendant—Mrs. Holmes—and the three witnesses who did testify to Holmes's alibi were called by the state, not by the defense. Thus, the present case presents an even stronger case for prejudice than <u>Washington</u> or <u>Luna</u>.

In making a prejudice determination, the strength or weakness of the State's case is relevant. "[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." <u>Strickland</u>, 466 U.S. at 696.[14] If the State had made a stronger case against Holmes at trial, Boal's failure to call Phelps as a witness might have been less prejudicial. The State's case, however, was weak.

---

[14] Although this point was made in <u>Strickland</u>, it applies equally well to our pre-<u>Strickland</u> analysis. We "scrupulously review the record" in cases involving the constitutional right to counsel. <u>Avery</u>, 308 U.S. at 447 (1940).

First, the victim's identification of Holmes was suspect. Factors to be considered in determining the reliability of a witness's identification of a defendant include

> the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

Neil v. Biggers, 409 U.S. 188, 199–200 (1972). Here, the victim's only opportunity to view her assailants was under poor lighting conditions. With regard to accuracy, the victim's description of Holmes as the taller of the two assailants conflicted with Willie Triplett's testimony that Miller was the other assailant, because Miller was taller than Holmes. Holmes also did not match her description of the shorter assailant with a sloppy Afro; uncontroverted evidence showed that Holmes wore his hair short in August of 1978. Moreover, several weeks elapsed between the rape and the victim's first positive identification of Holmes, after she had already passed over his mug shot in a photographic array. Accordingly, three of the factors that the Supreme Court has enunciated suggest that the victim's testimony is unreliable. Only the level of certainty demonstrated by the victim at trial weighs strongly in favor of giving credence to her identification of Holmes.

Second, the other witnesses who testified that Holmes was involved in the rape were far from credible. Willie Triplett, who testified that Holmes confessed the rape to him, had conflicted motives: the victim had identified Triplett's photograph out of the array as appearing similar to one of the assailants. Triplett's testimony not only inculpated Holmes—it exculpated himself. Frank Harvey's testimony that Holmes was involved in the attack was based on a questionable inference from an alleged statement of the late Ricky Miller. On cross examination, Harvey said that he did not know who had told him Holmes was involved. Harvey's testimony was unreliable hearsay.

Apart from this questionable testimony, the State's physical evidence established only that Holmes "could not be eliminated" as the perpetrator. (6 id. at 149.) Holmes and the assailant both had type A blood, but no indication was made as to what percentage of African-Americans have that blood type. Cf. United States v. Kearney, 420 F.2d 170, 171 (D.C. Cir. 1969) (noting that "[t]ype A blood appears to be typical of about 35% of the American Negro population"). Seen in context, this evidence has little persuasive value.

On balance, the State's case against Holmes hung on a slender thread of unreliable and contradictory evidence. In the face of a case so weakly supported, Neil Phelps's testimony would have considerably bolstered the defense. Mrs. Holmes's testimony, taken in conjunction with that of Phelps, might also have

tilted the scales in favor of acquittal. Boal's failure to call <u>any</u> alibi witnesses, relying only on the witnesses called by the State, is much more likely to have affected the trial when the weakness of the State's case is taken into account.

Reviewing the record de novo, therefore, we conclude that Boal's failure to interview and call Phelps and Mrs. Holmes was prejudicial to Holmes's defense.[15] Because the decision of the Kansas Court of Appeals could not have been justified by a finding of no prejudice, their conclusion that Holmes received effective assistance of counsel was an "unreasonable application" of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A writ of habeas corpus should have been issued by the district court.

---

[15] Boal also failed to interview or call several other potential alibi witnesses listed by Holmes—John Viens, Dan Carmack, Scott Phelps, and Mrs. Blacksher—who did not testify either at trial or at the post-conviction hearing. Because we hold that the failure to call Mrs. Holmes and Neil Phelps was prejudicial, we need not consider whether Boal also prejudiced Holmes's defense by not calling these other witnesses.

**III**

The judgment of the district court is **REVERSED**, and the case is

**REMANDED** with instructions to issue a writ of habeas corpus.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge